UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------X
                                                     :
RAPHAEL GOLB,                                        :
                                                     :
                              Petitioner,            :
                                                     :
              v.                                     :          15 Civ. 1709 (KPF)
                                                     :
THE ATTORNEY GENERAL OF THE STATE                    :          OPINION AND ORDER
OF NEW YORK,                                         :
                                                     :
                              Respondent.            :
                                                     :
----------------------------------------------------- X

> USDC SDNY
> DOCUMENT
> ELECTRONICALLY FILED
> DOC #: _____
> DATE FILED: January 21, 2016

KATHERINE POLK FAILLA, District Judge:

Petitioner Raphael Golb was convicted in November 2010 in New York

State Supreme Court, New York County, of numerous criminal offenses

stemming from a startlingly intricate scheme to steal the identities of

individuals who took academic positions contrary to those espoused by

Petitioner's father. Petitioner challenged his conviction at various levels of the

New York State court system, in the course of which 19 of his convictions were

upheld. Thereafter, on March 9, 2015, Petitioner filed a petition for a writ of

habeas corpus pursuant to 28 U.S.C. § 2254 (the "Petition") in this Court, in

which he challenged his remaining convictions for criminal impersonation in

the second degree and forgery in the third degree.

In broad summary, Petitioner contends that, under *Shuttlesworth* v. *City*

*of Birmingham*, 382 U.S. 87 (1965), and its progeny, he is entitled to a new trial

on all counts. Alternatively, Petitioner argues that his convictions should be

vacated because the underlying criminal impersonation and forgery statutes

are unconstitutionally overbroad and vague, and because the trial court contravened the Supreme Court's decision in *Garrison* v. *Louisiana*, 379 U.S. 64 (1964).  For the reasons that follow, the Petition is granted in part and denied in part; two of Petitioner's nineteen convictions are reversed, and the remainder are left undisturbed.

**BACKGROUND**[1]

## A.    Factual Background

This case grew out of an academic disagreement over the origin of the Dead Sea Scrolls (the "Scrolls"), which were discovered at an archeological site called Qumran in the 1940s and 1950s.  Many scholars have opined that the Scrolls were written by a Jewish sect known as the Essenes, who lived close to the caves where the Scrolls were found.

Norman Golb, a professor at the University of Chicago, has argued against this view.  Professor Golb believes that the Dead Sea Scrolls were penned by a variety of different authors and kept in Jerusalem's libraries until 70 CE, when they were moved to caves along the Dead Sea to keep them safe

---

[1]    The facts recited in this section are drawn from the parties' submissions, including the Petition (Dkt. #1), the Attorney General's response to the Petition (the "Response") (Dkt. #18), and the exhibits accompanying those documents.

For convenience, the Court will refer to Petitioner's opening brief as "Pet. Br." (Dkt. #3); Respondent's opposition brief as "Resp. Opp." (Dkt. #19); Petitioner's reply brief as "Pet. Reply" (Dkt. #21); and the parties' supplemental briefs as "Pet. Sup. Br." (Dkt. #24) and "Resp. Sup. Br." (Dkt. #23).

Parenthetical page numbers preceded by "A" are references to Petitioner's Appendix in the New York Court of Appeals, which is included in the Response as Exhibit F; those preceded by "SA" are references to Respondent's Supplemental Appendix in the New York Court of Appeals, which is included in the Response as Exhibit H.

2

from invading Roman soldiers.  (Pet. Br. 6).  Petitioner is Professor Golb's son, and he shares his father's views regarding the origin of the Scrolls.  (*Id.*).

In 2008, Petitioner assumed the identities of three academics — Frank Moore Cross, Lawrence Schiffman, and Jonathan Seidel — in order to send a series of emails regarding the Scrolls.  Those emails formed the basis of Petitioner's prosecution.

### 1.    The Frank Moore Cross Emails

In mid-2008, the North Carolina Museum of Natural Sciences opened a Scrolls exhibit, and invited University of North Carolina Professor Bart Ehrman to lecture at the exhibit.  (SA 1091).  On July 17, 2008, Petitioner wrote an anonymous blog post, arguing that the museum should not have allowed Professor Ehrman to deliver a lecture because he (Professor Ehrman) was not a Scrolls "specialist."  (*Id.* at 1091-96).  The blog post also criticized Professor Ehrman's suggestion that the Essenes were the likely authors of the Scrolls. (*Id.*).

Though the blog post certainly communicated his point, Petitioner upped the ante.  On July 20, 2008, Petitioner sent an email from frank.cross2@gmail.com to four scholars at the University of North Carolina. (SA 1013-16).  The email contained a link to Petitioner's anonymous blog post and said, "It looks like Bart has gone and put his foot in his mouth again ... I'm seeing this crop up everywhere on the web."  (*Id.*).  Petitioner signed the email "Frank Cross."  (*Id.*).  Petitioner acknowledges that Frank Moore Cross was a

"well-known" Dead Sea Scrolls scholar who taught at Harvard University and Wellesley College.  (Pet. Br. 9-10).[2]

### 2.     The Lawrence Schiffman Emails

A few months later, in the fall of 2008, the Scrolls were exhibited at the Jewish Museum in New York City.  The Jewish Museum invited Professor Lawrence Schiffman, then Chair of the Hebrew and Judaic Studies Department at New York University ("NYU"), to lecture at its exhibit.  (SA 1, 56, 1072). Professor Schiffman has written extensively about the Dead Sea Scrolls, and he believes that the Scrolls were written by "a sect at Qumran."  (*Id.* at 4, 19).

On August 4, 2008, Petitioner published an article on www.NowPublic.com, using the pseudonym "Peter Kaufman" (hereinafter, the "Kaufman article").  (SA 1072-80).  The Kaufman article accused Professor Schiffman of plagiarizing some of Norman Golb's ideas.  (*Id.*).  Here, again, it was not enough for Petitioner to publish the article: Later that same day, Petitioner used the email address "larry.schiffman@gmail.com" to send the following message to four of Professor Schiffman's graduate students:

> Miryam, Sara, Cory, Ariel,
>
> Apparently, someone is intent on exposing a minor failing of mine that dates back almost fifteen years ago.
>
> You are not to mention the name of the scholar in question to any of our students, and every effort must be made to prevent this article from coming to their attention.  This is my career at stake.  I hope you will all understand.

---

[2]     Professor Cross died in 2012.

> http://www.nowpublic.com/culture/plagiarism-and-dead-sea-Scrolls-did-nyu-professor-snitch-chicago-historians-work
>
> Lawrence Schiffman

(*Id.* at 949).  The link at the bottom of the email directed readers to the Kaufman article.

The following day, August 5, 2008, Petitioner sent a similar message from "larry.schiffman@gmail.com" to every member of Professor Schiffman's department at NYU.  (SA 38, 958).  The message said:

> Dear colleagues,
>
> Apparently, someone is intent on exposing a minor failing of mine that dates back almost fifteen years ago.
>
> Every effort must be made to prevent this article from coming to students' attention. This is my career at stake.  I hope you will all understand.
>
> http://www.nowpublic.com/culture/plagiarism-and-dead-sea-Scrolls-did-nyu-department-chairman-pilfer-chicago-historians-work
>
> Lawrence Schiffman

(*Id.* at 958).

Not content to rest on these emails, Petitioner also emailed the Provost of NYU and the Dean of the NYU Graduate School of Arts and Sciences as Professor Schiffman, asking what he could do to "counter charges of plagiarism that ha[d] been raised against [him]."  (SA 956-57).  Both emails contained a link to the Kaufman article.  (*Id.*).  Shortly thereafter, Petitioner sent an email from "Lawrence Schiffman" to NYU's student newspaper, imploring its staff "not to publish a word" about any plagiarism accusations.  (*Id.* at 955).

At Petitioner's trial, Professor Schiffman testified that he felt "very attacked" by Petitioner's emails, "and basically for like a month I couldn't do [any]thing but respond to people's inquiries."  (SA 24).

### 3.    The Jonathan Seidel Emails

In the fall of 2008, the Royal Ontario Museum (the "ROM") in Toronto also hosted a Scrolls exhibit.  On November 22, 2008, Petitioner sent an email from seidel.jonathan@gmail.com[3] to the Board of Trustees at the ROM, stating:

> The public has the right to know whether the ROM exhibit will indeed present the two basic theories [regarding the origin of the Dead Sea Scrolls] in a scientifically neutral manner ... , or if it will rather stick to a "low-keyed assertion of the mainstream view." Furthermore, the public has a right to know if University of Chicago historian Norman Golb, who is widely considered to have debunked the traditional theory of the Dead Sea Scrolls in his book, will be excluded from participating in the museum's lecture series[.]

(SA 859-61).  Petitioner signed the email "Jonathan Seidel."  (*Id.* at 861).

Petitioner later sent the Board of Trustees two follow-up emails (still as Jonathan Seidel), urging them to include Professor Golb's ideas in their lecture series.  (*Id.* at 862-63).

Soon after Petitioner wrote to the Board of Trustees, he used his "seidel.jonathan@gmail.com" account to contact Dr. Risa Levitt Kohn (SA 864), the curator for the ROM exhibit (*id.* at 860).  Petitioner asked Dr. Kohn if she was "planning to answer Golb's critique of [her] catalogue."  (*Id.* at 864).

---

[3]    Professor Jonathan Seidel teaches Judaic Studies at the University of Oregon and Portland State University.  (SA 332).  Professor Seidel studied with Professor Schiffman at NYU in the 1980s.  (*Id.* at 333).

Finally, Petitioner sent emails from "seidel.jonathan@gmail.com" to dozens of Dead Sea Scroll scholars; curiously, however, these emails disparaged his father's work.  (SA 865-66, 884).  Among other things, the emails announced that Norman Golb's "Chicago filth must be answered as quickly as possible, so please let me know if you're willing to help out."  (*Id.* at 865).  Petitioner signed two of these emails "Jonathan S," and he signed the third "Jonathan Seidel."  (*Id.* at 865-66, 884).

## B.    Procedural Background

### 1.    The Prosecution in New York State Supreme Court

Petitioner was charged with violating multiple sections of the New York Penal Code.  In particular, he was charged with two counts of identity theft in the second degree, in violation of section 190.79; 15 counts of identity theft in the third degree, in violation of section 190.78; ten counts of forgery in the third degree, in violation of section 170.05; 20 counts of criminal impersonation in the second degree, in violation of section 190.25; three counts of aggravated harassment in the second degree, in violation of section 240.30, and one count of unauthorized use of a computer, in violation of section 156.05.  (A 3-24).

At his trial, Petitioner requested several specific jury instructions for the forgery and criminal impersonation charges that are relevant here.  (A 50-54). Under New York law, "[a] person is guilty of forgery in the third degree when, with intent to defraud, deceive or injure another, he falsely makes, completes or alters a written instrument."  N.Y. Penal Law § 170.05.  By contrast, "[a]

7

person is guilty of criminal impersonation in the second degree when he ... [i]mpersonates another and does an act in such assumed character with intent to obtain a benefit or to injure or defraud another; or ... [i]mpersonates another by communication by internet website or electronic means with intent to obtain a benefit or injure or defraud another[.]"  N.Y. Penal Law § 190.25.

Petitioner asked the trial court to instruct the jury that, under these two statutes, an "injury" is

> not limited to financial injury. However, not all injuries are the subject of the criminal law. [i] Intending to [harm] another's reputation by disseminating falsehoods is not the type of harm that the criminal law recognizes. That type of injury may be redressed in the civil courts ... [ii] Similarly, the injury intended must go beyond intending to have another spend time responding to accusations or criticisms. A defamation does not become criminal simply because the alleged injured party spends time responding to, or countering, what he or she believes to be falsehoods ... [iii] Similarly, intending to abuse, deride, provoke, with the use of words, even vulgar words, is not the type of harm that the criminal law recognizes.

(A 50).

Petitioner also requested the following instruction defining a "benefit" under the criminal impersonation statute:

> [N]ot all benefits are the subject of the criminal law.  The fact that a defendant may gain emotional pleasure from harming another's reputation, from informing the public or the academic community of perceived wrongdoing, from provoking debate, from getting another to respond to criticisms, and/or from irritating another is not the type of benefit that the criminal law recognizes.

(A 51).

8

Finally, Petitioner requested an instruction that, under the forgery statute, an "[i]ntent to defraud means an intention to deceive another person, and induce such person, in reliance on the deception, to assume, create, transfer, alter or terminate a right, obligation, or power." (A 52).

In addition to submitting his own instructions, Petitioner also objected to the trial court's proposed instructions. (A 56-59). He observed that the "[c]ourt's proposed charge d[id] not define 'injury,'" and argued that "[l]eaving this crucial term to be interpreted as anything 'hurtful' ... renders the term unconstitutionally vague and overbroad." (*Id.* at 57). Similarly, he argued, "[d]efining benefit as 'any gain or advantage,' no matter how intangible, psychological or spiritual, renders the term unconstitutionally vague and impossibly overbroad." (*Id.*). Finally, Petitioner objected that the court's definition of the term "defraud" was "both vague and overbroad." (*Id.* at 56). Under the trial court's definition, Petitioner argued, he could be convicted if he assumed an identity with the intent to "hurt someone's feelings" or criticize someone's scholarship, which, in his view, would be unconstitutional. (*Id.* at 57).

Despite Petitioner's objections, the trial court did not define the word "injury" for the jury, and it defined a benefit as "[a]ny gain or advantage to the beneficiary ... includ[ing] any gain or advantage to a third person pursuant to the desire or consent of the beneficiary." (SA 814). The trial court also defined an "intent to defraud" as a "conscious objective or purpose ... to deceive or trick another with intent to deprive that person of his or her right or in some

9

manner to do him or her an injury"; the court did not explain in greater detail what this "injury" might entail.  (*Id.* at 806).

The jury convicted Petitioner on 30 counts: two counts of identity theft in the second degree; 14 counts of criminal impersonation in the second degree; ten counts of forgery in the third degree; three counts of aggravated harassment in the second degree; and one count of unauthorized use of a computer.  *People* v. *Golb*, 960 N.Y.S.2d 66, 67 (1st Dep't 2013) ("*Golb I*"). Petitioner was sentenced to an aggregate term of six months' imprisonment. *Id.*

### 2.    The Appeal to the First Department

Defendant appealed his case to the Appellate Division, First Department, arguing, in relevant part, that the statutes under which he was convicted were unconstitutionally vague and overbroad.  *Golb I*, 960 N.Y.S.2d at 69.  He also insisted that it was:

> constitutionally impermissible to include an intent to influence a constitutionally-protected academic debate within the concept of fraud, injury or benefit, that allowing injury to reputation to satisfy the injury element would effectively revive the long-abandoned offense of criminal libel, and that, in any event, the alleged truth of the content of the emails should have been permitted as a defense.

*Id.* at 68.

The Appellate Division rejected these arguments and held that the challenged statutes were not "vague or overbroad on [their] face or as applied." *Golb I*, 960 N.Y.S.2d at 69.  The court explained that "[t]he People were

10

required to prove that defendant had the specific fraudulent intent to deceive email recipients about his identity, and to obtain benefits or cause injuries as a result of the recipients' reliance on that deception." *Id.* In other words, "[t]he statutes criminalized the act of impersonation and its unlawful intent, not the content of speech falsely imputed to the victims." *Id.*

The Appellate Division further insisted that the trial court "was under no obligation to limit the definitions of 'injure' or 'defraud'—terms used in the forgery and criminal impersonation statutes—to tangible harms such as financial harm." *Golb I*, 960 N.Y.S.2d at 68 (citations omitted). In addition, the First Department found that the trial court "properly employed the statutory definition of 'benefit' as 'any gain or advantage' to [the] defendant or to another person." *Id.* (citation omitted). In any event, the court found, "the evidence established that [Petitioner] intended harm that fell within the plain meaning of the term 'injure,' and that was not protected by the First Amendment, including damage to the careers and livelihoods of the scholars he impersonated." *Id.* At the same time, Petitioner "intended to create specific benefits for his father's career. The fact that the underlying dispute between [Petitioner] and his father's rivals was a constitutionally[ ]protected debate does not provide any First Amendment protection for acts that were otherwise unlawful." *Id.*

Ultimately, the Appellate Division upheld Petitioner's convictions on 29 counts, but reversed the conviction on one count of identity theft in the second

degree, finding insufficient evidence to support it.  *See Golb I*, 960 N.Y.S.2d at 69.

### 3.   The Proceedings Before the New York Court of Appeals

On March 11, 2013, Petitioner was granted leave to appeal the First Department's decision to the New York Court of Appeals.  *People* v. *Golb*, 20 N.Y.3d 1099 (2013) ("*Golb II*").  In a split decision, the Court of Appeals affirmed in part and reversed in part.  *People* v. *Golb*, 23 N.Y.3d 455 (2014) ("*Golb III*").

#### a.   The Majority Opinion

##### i.   The Criminal Impersonation Convictions

The majority opinion began by considering whether the trial court had an obligation to define the terms "injure" and "benefit" under New York's criminal impersonation statute.  *See Golb III*, 23 N.Y.3d at 464-66.  It explained that

> [c]ases applying Penal Law § 190.25 [the criminal impersonation statute] have traditionally involved monetary fraud or interference with government operations … Here, [the] defendant did not cause any pecuniary loss or interfere with governmental operations. While we agree with [the] defendant that the statutory terms "injure" and "benefit" cannot be construed to apply to *any* injury or benefit, no matter how slight, we conclude that injury to reputation is within the "injury" contemplated by Penal Law § 190.25. Many people, particularly with a career in academia, as relevant to this case, value their reputations at least as much as their property, and we believe the legislature intended that the scope of the statute be broad enough to capture acts intended to cause injury to reputation.
>
> Accordingly, a person may be found guilty of criminal impersonation in the second degree if he or she impersonates another with the intent to cause a tangible, pecuniary injury to another, or the intent to interfere with governmental operations (*see e.g. People* v. *Hooks,* 71 A.D.3d 1184, 896 N.Y.S.2d 501 [3d Dept.

12

> 2010]; *People* v. *Nawrocki,* 163 A.D.2d 887, 558
> N.Y.S.2d 769 [4th Dept. 1990]). In addition, a
> person who impersonates someone with the intent to harm the
> reputation of another may be found guilty of this crime.
> Here, there was sufficient evidence to support the jury's
> finding that [the] defendant's emails impersonating
> Schiffman, Seidel and Cross were more than a prank
> intended to cause temporary embarrassment or
> discomfiture, and that he acted with intent to do real
> harm.

*Id.* at 465-66 (emphasis and bracketed material in original).  Thus, the Court of Appeals upheld the convictions on nine counts of criminal impersonation in the second degree, which were based on the emails that Petitioner sent as Schiffman, Seidel, and Cross.  *Id.* at 466, 469.

At the same time, the Court of Appeals vacated the convictions for criminal impersonation that were based on "the mere creation of email accounts" in other peoples' names.  *Golb III*, 23 N.Y.3d at 466.  The Court explained that the creation of email accounts — "in contrast to the use of those accounts to send emails" — does not cause "substantial harm to anyone."  *Id.* As a result, creating email accounts "does not constitute criminal conduct under Penal Law § 190.25."  *Id.*

The Court of Appeals also vacated the conviction for criminal impersonation that was based on "the email sent from the Seidel email address to Dr. Kohn, asking her opinion on the differing theories about the Scrolls and whether she was planning to answer Professor Golb's critique."  *Golb III*, 23 N.Y.3d at 466.  It found that "this email sent in another person's name d[id] not

prove the requisite intent to cause injury, either to reputation or otherwise."
*Id.*

### ii.     The Forgery Convictions

The Court of Appeals upheld Petitioner's convictions on ten counts of forgery in the third degree.  The Court explained that it was possible to commit forgery with an intent to "'defraud, deceive or injure another,'" and in this case, there was "sufficient evidence to show that [the] defendant deceived people by sending emails from accounts in the names of Schiffman, Seidel and Cross." *Golb III*, 23 N.Y.3d at 468 (quoting N.Y. Penal Law § 170.05).

### iii.     The Convictions Under Other Statutes

The Court of Appeals vacated Petitioner's convictions for aggravated harassment in the second degree, unauthorized use of a computer, and identity theft in the second degree.  First, it vacated the convictions for aggravated harassment, finding the underlying statute to be "unconstitutionally vague and overbroad."  *Golb III*, 23 N.Y.3d at 467.  The relevant section of the harassment statute made it a crime to communicate with another person "in a manner likely to cause annoyance or alarm," with the "intent to harass, annoy, threaten or alarm."  N.Y. Penal Law § 240.30.  According to the Court of Appeals, this language "criminalize[d], in broad strokes, any communication that ha[d] the intent to annoy"; thus, there was simply "'no fair reading'" of the statute that "'support[ed] or even suggest[ed] the constitutionally necessary limitations on its scope.'" *Golb III*, 23 N.Y.3d at 467 (quoting *People* v. *Dietze*, 75 N.Y.2d 47, 52 (1989)).

14

The Court of Appeals also vacated Petitioner's conviction for unauthorized use of a computer under N.Y. Penal Law § 156.05, concluding that "the definitions and wording of [that] statute and the legislative history indicate that the statute is intended to reach a person who accesses a computer system without permission (i.e., a hacker) and the language does not appear to encompass [Petitioner's] conduct here." *Golb III*, 23 N.Y.3d at 468. Finally, the Court found insufficient evidence to support the remaining count of identity theft in the second degree. *Id.* at 468-69.

Because the Court of Appeals sustained Petitioner's convictions on only 19 of 29 counts (nine counts of criminal impersonation in the second degree and ten counts of forgery in the third degree), it remanded the case to the trial court for resentencing. *Golb III*, 23 N.Y.3d at 471-72.

### b.     Chief Judge Lippman's Opinion

Chief Judge Lippman concurred in part and dissented in part.  He agreed with the majority's decision to vacate some of Petitioner's convictions, but, in his view, the indictment should have been "dismiss[ed] ... in its entirety." *Golb III*, 23 N.Y.3d at 469-71 (Lippman, C.J., concurring and dissenting).

The Chief Judge argued that the criminal impersonation statute was overbroad because it criminalized impersonation that was "meant to be harmful or beneficial in any way." *Golb III*, 23 N.Y.3d at 470 (Lippman, C.J., concurring and dissenting).  He further found that "[t]he problem of the statute's substantial overbreadth is not obviated by the Court's pronouncement that the enactment should not be understood to criminalize conduct not

15

intended to cause 'real harm.'" *Id.*  In his view, "many things said using an assumed identity are constitutionally protected from civil or criminal sanction, even though they are more than pranks and are intended to cause real harm or to obtain real benefit." *Id.*  He also expressed concern that "this prosecution's use of the statute was not limited in the way the Court now says it should have been[.]" *Id.*

The Chief Judge found the forgery statute to be "similarly objectionable." *Golb III*, 23 N.Y.3d at 471.  He explained that treating "pseudonymous emails as forgeries when they are made with some intent to 'injure' in some undefined way is no different than penalizing impersonation in Internet communication for the same amorphous purpose.  Both treatments give prosecutors power they should not have to determine what speech should and should not be penalized." *Id.*

The Chief Judge concluded by observing that "[c]riminal libel has long since been abandoned, not least of all because of its tendency in practice to penalize and chill speech that the constitution protects, and it has been decades since New York's criminal libel statute was repealed." *Golb III*, 23 N.Y.3d at 471 (citing *Garrison* v. *Louisiana,* 379 U.S. 64 (1964) and *Ashton* v. *Kentucky*, 384 U.S. 195 (1966)).  As a result, he argued, "[t]he use of the criminal impersonation and forgery statutes now approved amounts to an atavism at odds with the First Amendment and the free and uninhibited exchange of ideas it is meant to foster." *Id.*

### c.    The Motion for Reargument

Petitioner moved for reargument, noting first that the Court of Appeals had limited the scope of the statutes under which he convicted, so that they would not criminalize conduct that caused "*any* injury or benefit, no matter how slight." (Response, Ex. K at 1-2 (quoting *Golb III*, 23 N.Y.3d at 465)).  He recalled that he had been "tried under the much broader theory that *any* intended injury or benefit, no matter how trivial or spiritual, was sufficient to find him guilty." (*Id.*).  As a result, Petitioner insisted, under *Shuttlesworth* v. *City of Birmingham*, 382 U.S. 87 (1965), and its progeny, he was entitled to a new trial. (*See generally* Response, Ex. K).

On September 4, 2014, the Court of Appeals denied Petitioner's motion for reargument without comment.  *People* v. *Golb*, 24 N.Y.3d 932 (2014) ("*Golb IV*").

### 4.    The Proceedings on Remand

Following remand to the trial court, Petitioner moved to set aside the jury's verdict under N.Y. Crim. Proc. Law § 330.30. (*See* Response, Ex. M at 2). Essentially, Petitioner argued that he was entitled to a new trial for the reasons stated in his motion for reargument. (*Id.* at 23).  The trial court found that Petitioner's 330.30 motion was time-barred because he had failed to bring the motion before his first sentencing proceeding. (*Id.*).  As a result, the trial court denied Petitioner's motion, and resentenced him to two months' imprisonment. (*Id.* at 2, 23).

17

Petitioner appealed the trial court's denial of his 330.30 motion to the First Department.  (*See generally* Response, Ex. M).  The Appellate Division held that it would be procedurally "improper to consider or review [Petitioner's] present challenges regarding his CPL 330.30 motion."  *People* v. *Golb*, 5 N.Y.S.3d 46, 47 (1st Dep't 2015) ("*Golb V*").  Moreover, the Appellate Division maintained, even if Petitioner's claims were "reviewable on this appeal, his CPL 330.30 motion was properly denied as untimely since it was not made prior to the original sentence."  (*Id.* (citations omitted)).  Finally, "even upon considering the merits of [Petitioner's] argument that he was tried under an unconstitutionally broad reading of statutes that were subsequently narrowed," the Appellate Division found that "this issue has already been addressed by the Court of Appeals.  [Petitioner] raised this exact argument on his application to the Court of Appeals for reargument which was also denied."  *Id.* (internal citations omitted).

The Court of Appeals declined to review the Appellate Division's decision. *People* v. *Golb*, 26 N.Y.3d 929 (2015) ("*Golb VI*").

## DISCUSSION

### A.   Applicable Law

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court cannot grant a petition for a writ of habeas corpus based on a claim that was "adjudicated on the merits in State court proceedings" unless a state court's decision: (i) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by

18

the Supreme Court of the United States"; or (ii) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).  This is a "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt."  *Cullen* v. *Pinholster*, 563 U.S. 170, 181 (2011) (quoting *Woodford* v. *Visciotti*, 537 U.S. 19, 24 (2002) (per curiam)).

Federal law is "clearly established" when it is expressed in "the holdings, as opposed to the dicta, of [the Supreme Court's] decisions."  *Howes* v. *Fields*, __ U.S. __, 132 S. Ct. 1181, 1187 (2012) (internal quotation marks omitted).  A state court's decision is "contrary" to clearly established federal law when the state court "applies a rule that contradicts the governing law set forth in" a Supreme Court opinion or "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a … different [result]."  *Williams* v. *Taylor*, 529 U.S. 362, 405-06 (2000).  And a state court's decision can only be considered "unreasonable" if "there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents."  *Harrington* v. *Richter*, 562 U.S. 86, 102 (2011); *see also Woods* v. *Donald*, ___ U.S. ___, ___, 135 S. Ct. 1372, 1376 (2015) (per curiam)(explaining that AEDPA only allows federal habeas courts to overturn state court decisions "when there could be no reasonable dispute that they were wrong"); *Vega* v. *Walsh*, 669 F.3d 123, 126 (2d Cir. 2012).

When a federal court reviews a state court's factual determinations, those decisions "shall be presumed to be correct," and that presumption can only be rebutted by "clear and convincing evidence."  28 U.S.C. § 2254(e)(1); *see also McKinney* v. *Artuz*, 326 F.3d 87, 101 (2d Cir. 2003).

**B.     Under *Shuttlesworth* and Its Progeny, Petitioner Is Entitled to a New Trial on Two of His Nineteen Counts of Conviction**

**1.     This Court Must Give AEDPA Deference to the State Court's Determination That Petitioner Was Not Entitled to a New Trial**

After the Court of Appeals rendered its decision, Petitioner moved to reargue his case.  (Response, Ex. K at 1).  In his motion, Petitioner insisted that under *Shuttlesworth* and its progeny, he had a constitutional right to a new trial.  (*See generally* Response, Ex. K).  Nevertheless, the Court of Appeals denied Petitioner's motion for reargument without comment.  *Golb IV*, 24 N.Y.3d at 932.  This summary denial of Petitioner's constitutional claim is entitled to AEDPA deference.

As explained above, a state court's decision is entitled to AEDPA deference if it resolves a federal constitutional question "on the merits."  28 U.S.C. § 2254(d).  The Supreme Court has explained that, "when a state court issues an order that summarily rejects without discussion *all* the claims raised by a defendant, including a federal claim that the defendant subsequently presses in a federal habeas proceeding, the federal habeas court must presume (subject to rebuttal) that the federal claim was adjudicated on the merits." *Johnson* v. *Williams*, __ U.S. __, 133 S. Ct. 1088, 1091 (2013) (emphasis in original); *see also Harrington*, 562 U.S. at 99.  This presumption can only be

rebutted by evidence or a feature of state law suggesting that the state court disposed of the federal issue on other grounds.  *See Harrington*, 562 U.S. at 99-100.

Here, there is no reason to believe that the Court of Appeals did something other than reject the merits of Petitioner's *Shuttlesworth* claim when it denied his motion for reargument.  *See Golb V*, 5 N.Y.S.3d at 47 ("[E]ven upon considering the *merits of [Petitioner's* Shuttlesworth*] argument ... ,* we find that this *issue has already been addressed by the Court of Appeals.*  [Petitioner] raised this exact argument on his application to the Court of Appeals for reargument which was ... denied." (emphases added) (internal citations omitted)).  As a result, this Court must accord AEDPA deference to the Court of Appeals' decision to reject Petitioner's constitutional argument.  *See* 28 U.S.C. § 2254(d).

### 2. It Was Unreasonable for the Court of Appeals to Deny Petitioner's Request for a New Trial, But Only as to Two of the Criminal Impersonation Counts

#### a. *Shuttlesworth* and Subsequent Decisions

Petitioner argues that the Court of Appeals acted contrary to *Shuttlesworth* when it denied his request for a new trial; as such, a brief discussion of that case is in order.  In *Shuttlesworth,* the Supreme Court considered a city ordinance that prohibited "stand[ing] or loiter[ing] upon any street or sidewalk ... after having been requested by any police officer to move on." 382 U.S. at 90.  The Court noted that, if the statute were read literally, it would allow individuals to "stand on a public sidewalk in Birmingham only at

the whim of any police officer of that city." *Id.* Such a reading would, of course, be unconstitutional. *Id.* To avoid this constitutional problem, the Alabama Court of Appeals ruled that the ordinance was only applicable to individuals who "st[ood], loiter[ed], or walk[ed] on a street or sidewalk *so as to obstruct [the] free passage [of others]*," and ignored a police officer's request "to move on." *Id.* at 91 (emphasis added).

Crucially, however, this limiting construction was adopted two years after Fred Shuttlesworth was convicted for violating the ordinance. *Shuttlesworth,* 382 U.S. at 91-92. Thus, the Supreme Court observed:

> [The trial court] may have found [Mr. Shuttlesworth] guilty only by applying the literal—and unconstitutional—terms of the ordinance. Upon the evidence before him, the trial judge as finder of the facts might easily have determined that [Mr. Shuttlesworth] had created an obstruction, but had subsequently moved on. The court might alternatively have found that [Mr. Shuttlesworth] himself had created no obstruction, but had simply disobeyed Patrolman Byars' instruction to move on. In either circumstance the literal terms of the ordinance would apply; in neither circumstance would the ordinance be applicable as now construed by the Alabama Court of Appeals. *Because we are unable to say that the Alabama courts in this case did not judge the [Mr. Shuttlesworth] by an unconstitutional construction of the ordinance, [his] conviction under [the ordinance] cannot stand.*

*Id.* at 92 (emphasis added).

Petitioner argues that his case is on all fours with *Shuttlesworth.* (*See* Pet. Br. 3-4, 34). He reasons that he was convicted under laws that were overbroad, and that after his conviction, a state appellate court narrowed the reach of the relevant laws so that they would not offend the federal

constitution.  (*Id.*).  Petitioner contends that here, as in *Shuttlesworth*, there is no way to tell whether he would have been convicted if the trial court had applied the narrower construction of the relevant statutes.  (*Id.*).  In consequence, Petitioner insists, his convictions "cannot stand" (*id.* at 34), and the Court of Appeals' statement to the contrary was inconsistent with "'clearly established Federal law'" (*id.* at 27 (quoting 28 U.S.C. § 2254(d))).

Petitioner's argument places too much emphasis on *Shuttlesworth*, and too little emphasis on the Supreme Court decisions that followed it. *Shuttlesworth* held that, when a defendant is convicted under an overbroad statute, *and the statutory overbreadth may have been the reason for the defendant's conviction*, the conviction cannot stand.  *See Shuttlesworth*, 382 U.S. at 92.  In the years since *Shuttlesworth* was decided, however, the Supreme Court has clarified that, when a defendant is convicted under an overbroad statute that is subsequently narrowed, and the overbreadth could not have affected the outcome of the defendant's case, the defendant will not be entitled to relief.

The clarification began with *Pope* v. *Illinois*, 481 U.S. 497 (1987).  In that case, two defendants were convicted under an Illinois obscenity statute that criminalized the sale of materials lacking serious value for "ordinary adults in the ... State of Illinois."  *Id.* at 499-500.  After their convictions, however, the Supreme Court held that, under the First Amendment, Illinois could not ban the sale of materials simply because adults in that state would find that the materials lacked "serious literary, artistic, political, or scientific value."  *Id.* at

23

500-01.  Rather, Illinois could only ban the sale of materials if no "reasonable person" — in Illinois or elsewhere — "would find such value in the material[s], taken as a whole."  *Id.*  While acknowledging that the defendants were convicted under a statute that had First Amendment flaws, the Court nonetheless found that they would not be entitled to new trials if: (i) the statute gave the defendants adequate "notice" that selling their magazines would be considered criminal; and (ii) the flawed jury instructions were harmless "beyond a reasonable doubt."  *Id.* at 502; *see also id.* at 503 (explaining that the flawed instructions could be considered harmless beyond a reasonable doubt if, given the evidence in the record, "no rational juror, ... properly instructed," could acquit the defendants).

    In later cases, the Court confirmed that, if a defendant is convicted under an overbroad statute that is subsequently given a limiting construction, the reviewing court must consider whether any overbreadth contributed to the verdict in the defendant's case.  When a statute is overbroad, one could say that the statute is missing some element that would allow it to pass constitutional muster.  *Cf. Descamps* v. *United States*, __ U.S. __, 133 S. Ct. 2276, 2292 (2013) (suggesting, in a different context, that "[m]ost overbroad statutes can ... be characterized as missing an element").  And when a defendant is convicted under jury instructions that omit an element of a crime, an appellate court must consider whether the flawed instructions were harmless "beyond a reasonable doubt."  *Neder* v. *United States*, 527 U.S. 1, 15 (1999).  If the reviewing court determines that the instructions were indeed

24

harmless beyond a reasonable doubt, the defendant will not be entitled to a new trial. *See id.* at 15-16.

While its analysis is guided by the principles articulated in *Pope* and *Neder*, this Court is also mindful that "[t]he test for whether a federal constitutional error was harmless depends on the procedural posture of the case." *Davis* v. *Ayala*, __ U.S. __, 135 S. Ct. 2187, 2197 (2015). On direct appeal, a court must ask whether any constitutional error was "harmless beyond a reasonable doubt." *Id.* (quoting *Chapman* v. *California*, 386 U.S. 18, 24, (1967)). "In a collateral proceeding," however, "the test is different." *Id.* A federal habeas petitioner is only entitled to relief if he or she can demonstrate that a constitutional error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht* v. *Abrahamson*, 507 U.S. 619, 637 (1993) (quoting *Kotteakos* v. *United States*, 328 U.S. 750, 776 (1946)). This more lenient test serves "the States' interest in finality," promotes state "sovereignty over criminal matters," and ensures that the writ of habeas corpus serves its purpose of affording relief only to those "grievously wronged." *Id.*; *see also Fry* v. *Pliler*, 551 U.S. 112, 117 (2007).

Applying all of these cases, the Court concludes that Petitioner is entitled to a new trial on two counts of criminal impersonation in the second degree, Counts 33 and 37. He is not, however, entitled to a new trial on the remaining seven counts of criminal impersonation in the second degree. Nor is Petitioner entitled to a new trial on any of the ten counts of forgery in the third degree.

25

### b.    Petitioner Is Entitled to a New Trial on Counts 33 and 37

After Petitioner was convicted on multiple counts of criminal impersonation in the second degree, the Court of Appeals narrowed the scope of the criminal impersonation statute.  The plain language of the statute provides that "[a] person is guilty of criminal impersonation in the second degree when he ... [i]mpersonates another ... with intent *to obtain a benefit or to injure* or defraud another[.]"  N.Y. Penal Law § 190.25 (emphasis added).  Following Petitioner's convictions, the Court of Appeals held that "the statutory terms 'injure' and 'benefit' c[ould not] be construed to apply to *any* injury or benefit, no matter how slight."  *Golb III*, 23 N.Y.3d at 465 (emphasis in original).  Instead, it concluded that, under section 190.25, an "intent ... to injure" is an intent to cause "real harm" or "substantial harm."  *Id.* at 466.  The Court of Appeals then identified three kinds of cases in which a defendant will have the requisite "intent ... to injure": (i) cases where the defendant "inten[ds] to cause a tangible, pecuniary injury to another"; (ii) cases where a defendant "inten[ds] to interfere with governmental operations"; and (iii) cases where a defendant "inten[ds] to harm the reputation of another."  *Id.*

Because Petitioner was convicted under an overbroad statute that was narrowed after his trial, the Court of Appeals should have considered whether the statutory overbreadth had any effect on Petitioner's case.  *See Shuttlesworth*, 382 U.S. at 92.  More specifically, the Court of Appeals should have considered whether: (i) the overbroad statute gave Petitioner adequate notice that his conduct would be considered criminal; *and* (ii) the overbreadth

26

of the jury instructions in Petitioner's case was harmless beyond a reasonable doubt. *See Pope*, 481 U.S. at 502-03. In light of AEDPA, this Court accepts as given that, when the New York Court of Appeals considered Petitioner's motion for reargument, it undertook both of these inquiries and determined that Petitioner was not entitled to relief. *See Harrington*, 562 U.S. at 98.

Reviewing the record, this Court concludes that no reasonable jurist could find the overbroad jury instructions to be harmless beyond a reasonable doubt with respect to Counts 33 and 37 of the indictment. Those counts alleged that Petitioner committed criminal impersonation in the second degree when he sent emails from the account of "seidel.jonathan@gmail.com" to dozens of Dead Sea Scrolls scholars on November 24, 2008 (the "November 24 email"), and December 6, 2008 (the "December 6 email"). (*See* A 16, 18, 27). These perplexing emails describe Professor Golb's views as "filth," and ask if anyone "could help prepare a response." (SA 865-66, 884).

To find that the overbroad instructions on Counts 33 and 37 were harmless beyond a reasonable doubt, one would have to find overwhelming evidence that Petitioner sent the two emails with the intent to cause "substantial harm" to someone's reputation, or with the intent to obtain more than a "slight" benefit. *Golb III*, 23 N.Y.3d at 465-66; *see Pope*, 481 U.S. at 502-03. Looking to the record, the Court finds some evidence that Petitioner sent the November 24 and December 6 emails with the intent to cause substantial harm to Jonathan Seidel's reputation. For example, after Petitioner sent his November 24 email, Dr. Eliot Braun responded that he was "appalled

27

by the language ... concerning 'Chicago filth.'" (SA 880).  Nevertheless,
Petitioner sent Dr. Braun a follow-up email — still as Jonathan Seidel — that
said: "I repeat, this is nothing but filth ... Golb has consistently misrepresented
the history of scholarship on [S]crolls and the [S]crolls themselves[.]" (*Id.*).  It is
not clear why Petitioner would repeat language that Dr. Braun deemed
offensive unless he was waging a campaign to damage Jonathan Seidel's
reputation among Near East scholars (including Dr. Braun).

Nevertheless, the record also contains evidence that Petitioner did not
send the November 24 and December 6 emails with the intent to harm
Jonathan Seidel's reputation.  Between November 21, 2008, and November 24,
2008, Petitioner sent multiple emails from the seidel.jonathan@gmail.com
account to the Royal Ontario Museum, urging the Board of Directors there to
include Professor Golb's theories in a Dead Sea Scrolls exhibit.  (SA 859-63).
These emails suggest that Petitioner was counting on Jonathan Seidel's good
name to help persuade the ROM to consider Professor Golb's work.  If
Petitioner were counting on Jonathan Seidel's good reputation, it is not clear
why he would send emails intending to damage it.

Faced with this conflicting evidence, a properly instructed jury might not
find that Petitioner sent the November 24 and December 6 emails to damage
Jonathan Seidel's reputation or to cause any other kind of "substantial harm."
*Golb III*, 23 N.Y.3d at 466.  Instead, a properly instructed jury might conclude
that Petitioner sent the November 24 and December 6 emails to draw attention
to his father's work, or to identify scholars who disagree with his father's

theories, or to obtain some "slight" personal satisfaction.  *Id.* at 465.  Because it is not clear that Petitioner sent the emails with the intent to cause "substantial harm," or to obtain more than a "slight" benefit, it was unreasonable for the Court of Appeals to conclude that the overbroad jury instructions on Counts 33 and 37 were harmless beyond a reasonable doubt. For the same reason, the Court finds that the overbroad jury instructions "had substantial and injurious effect or influence in determining the jury's verdict" on Counts 33 and 37.  *Brecht*, 507 U.S. at 637.  Petitioner is therefore entitled to a new trial on these two counts.

### c.   Petitioner Is Not Entitled to a New Trial on the Remaining Criminal Impersonation Counts

Counts 7, 10, 13, 16, 19, 25, and 46 of the indictment alleged that Petitioner committed criminal impersonation in the second degree by sending five emails as Lawrence Schiffman, one email as Jonathan Seidel, and one as Frank Moore Cross.  (*See* A 26-28).  Given the evidence in the record, it would have been reasonable for the Court of Appeals to conclude that: (i) Petitioner had adequate notice that sending these emails would be illegal; and (ii) the overbroad jury instructions for Counts 7, 10, 13, 16, 19, 25, and 46 were in fact harmless "beyond a reasonable doubt," *Pope*, 481 U.S. at 502-03 (and, *a fortiori*, did not have a "substantial and injurious effect or influence in determining the jury's verdict" under *Brecht*, *see Davis*, 135 S. Ct. at 2198-99). Accordingly, no new trial is warranted.

29

> **i.    Reasonable Jurists Could Conclude That Section 190.25 Gave Petitioner Adequate Notice That He Was Engaging in Criminal Conduct**

The plain language of section 190.25 prohibits impersonation with an "intent *to obtain a benefit or to injure* … another."  N.Y. Penal Law § 190.25 (emphasis added).  Reasonable jurists could conclude that, while this language might be "imprecise at its fringes," Petitioner should not have been "surprised to learn" that it criminalized impersonation with an intent to obtain a *substantial* benefit or cause a *substantial* injury.  *Osborne* v. *Ohio*, 495 U.S. 103, 116 (1990); *cf. Hamling* v. *United States*, 418 U.S. 87, 114-16 (1974) (finding that defendant convicted under an overbroad pornography statute should not have been surprised to learn that it was a crime to mail "hard-core pornography").  As the Court will explain below, there was overwhelming evidence that Petitioner intended to obtain substantial benefits or to cause substantial injuries when he sent the emails referenced in Counts 7, 10, 13, 16, 19, 25, and 46.  As a result, he had ample warning that his conduct was illegal.

> **ii.    Reasonable Jurists Could Conclude That the Overbroad Jury Instructions Were Harmless Beyond a Reasonable Doubt as to Counts 7, 10, 13, 16, 19, 25, and 46**

The record contains abundant evidence that Petitioner sent the five emails referenced in Counts 7, 10, 13, 16, and 19 with the intent to cause substantial harm to Lawrence Schiffman's professional reputation.  These five emails were sent to various members of Professor Schiffman's academic community, including his graduate students, the members of his academic

30

department at NYU, the Provost of NYU, the Dean of the NYU Graduate School of Arts and Sciences, and the staff at NYU's student newspaper.  (*See* A 26-27; SA 949, 955-58).  In all of these emails, Petitioner-as-Schiffman confessed that he had plagiarized Professor Golb's work.  (SA 949, 955-58).

As Professor Schiffman testified, plagiarism is a "very serious" concern in academia.  (SA 105).  If an academic were "caught plagiarizing, [he or she] would be thrown out of [his or her] tenure position, job, career, income."  (*Id.*). The five emails that Petitioner sent in Professor Schiffman's name seemed to acknowledge this fact: Each email reminded readers that Professor Schiffman's "career [was] at stake."  (*Id.* at 949, 955-58).  Moreover, during his own testimony, Petitioner acknowledged that plagiarism "is one of the more serious forms of unethical conduct anybody can engage in in the academic world."  (*Id.* at 496).  In light of this evidence, any reasonable, properly instructed jury would have concluded that Petitioner sent the emails from larry.schiffman@gmail.com with an intent to damage, in a substantial way, Professor Schiffman's professional reputation.  Thus, it would have been reasonable for the Court of Appeals to conclude that the overbroad jury instructions for Counts 7, 10, 13, 16, and 19 were harmless beyond a reasonable doubt.

Similarly, it would have been reasonable for the Court of Appeals to conclude that the overbroad jury instructions for Count 25 could be considered harmless beyond a reasonable doubt.  That Count alleged that Petitioner had sent an email from seidel.jonathan@gmail.com to the Board of Directors of the

31

ROM on November 22, 2008.  (*See* A 27).  This email insisted, among other things, that the "public ha[d] a right to know if University of Chicago historian Norman Golb ... [would] be excluded from participating in the museum's lecture series[.]"  (SA 860).

Unlike many of the other emails in this case, it is not clear that this message was written to damage someone's reputation.  The letter does take a few swipes at Dr. Risa Levitt Kohn, who curated the ROM's Dead Sea Scrolls exhibit.  (*See, e.g.*, SA 859 (suggesting that Dr. Kohn and other "San Diego exhibitors set out to confuse the public, in part by belittling the views of University of Chicago professor Norman Golb"); *id.* at 860 (calling one of Dr. Kohn's statements "shockingly obscurantist")).  Nevertheless, the dominant message in the email was that the "public ha[d] a right to know" whether Professor Golb's theories — and Professor Golb himself — would be included in the ROM's exhibit.  (*Id.* at 859-61).

Nor is it clear that Petitioner sent the email to the ROM in order to cause some other kind of "substantial harm."  As a result, the Court must consider whether there is overwhelming evidence that Petitioner sent the email to the ROM with an intent to obtain a benefit that was more than "slight."  In conducting this inquiry, this Court will presume that a monetary benefit is a substantial one.  *See Golb III*, 23 N.Y.3d at 465 ("Cases applying Penal Law § 190.25 have traditionally involved *monetary fraud* or interference with government operations." (emphasis added)).  The Court will also presume that a benefit is more than "slight" if it takes the form of a job opportunity, because

"[m]any people" value job opportunities "at least as much" as they value money or property.  *Id.*; *see also People* v. *Sherman*, 116 Misc. 2d 109, 110 (City Ct. 1982) (explaining that, under Section 190.25, "[t]he benefit sought need not be monetary"); *People* v. *Chive*, 189 Misc. 2d 653, 656 (Crim. Ct. 2001) (same).

Here, there is very strong evidence that Petitioner wrote the November 22 email to the ROM in an effort to secure a job opportunity for his father. Petitioner's email included links to several articles featuring his father's views, and then noted that "University of Chicago professor Norman Golb, the author of a well-known 450-page book on the [S]crolls, ... is interviewed or quoted as the *main authority* on the 'second theory' [of the origin of the Scrolls] in all the above-mentioned newspaper articles."  (SA 859 (emphasis added)).  Petitioner concluded his email with a statement that the "public ha[d] a right to know if University of Chicago historian Norman Golb, who is *widely considered to have debunked the traditional theory of the Dead Sea Scrolls* in his book, will be excluded from participating in the museum's lecture series[.]"  (*Id.* at 860 (emphasis added)).

Two days after Petitioner sent his email to the ROM, he sent a follow-up message, asking among other things if the ROM would "put together a balanced lecture series, *featuring Dr. Golb* and other major proponents of the second basic theory alongside defenders of the Qumran-sectarian theory, or [if the ROM would] continue the vindictive policy of exclusion implemented by Dr. Kohn in San Diego."  (SA 863 (emphasis added)).  Together with the statements in Petitioner's first email, this language constitutes clear evidence

33

that Petitioner was attempting to persuade the ROM to offer his father an opportunity to lecture on the Dead Sea Scrolls.  Because there is abundant evidence that Petitioner was writing to the ROM to obtain a benefit that was more than "slight," it would have been reasonable for the Court of Appeals to conclude that the overbroad jury instructions on Count 25 were harmless beyond a reasonable doubt.

Finally, it would have been reasonable for the Court of Appeals to conclude that the overbroad jury instructions on Count 46 were harmless beyond a reasonable doubt.  Count 46 alleged that Petitioner sent an email from "Frank Cross" to four scholars at the University of North Carolina, where Professor Bart Ehrman worked.  (*See* A 28; SA 1013-16, 1091).  The email stated: "It looks like Bart has gone and *put his foot in his mouth again* ... I'm seeing this crop up everywhere on the web." (SA 1013-16).  Just below this statement, Petitioner pasted a link to a blog post that quoted some of Professor Ehrman's statements about the Dead Sea Scrolls.  (*Id.*).  The clear implication of this email was that Professor Ehrman's professional opinions were so off-base that they were embarrassing to "Frank Cross," who was, by Petitioner's own estimation, a "well-known" Dead Sea Scrolls scholar.  (Pet. Br. 9-10).  Furthermore, by suggesting that Professor Ehrman had put his foot in his mouth "again," Petitioner implied that Professor Ehrman had repeatedly made embarrassing remarks to other scholars.  Thus, it was reasonable for the Court of Appeals to conclude that a properly instructed jury would necessarily find

34

that Petitioner sent the email to Professor Ehrman's colleagues with an intent
to cause substantial harm to Professor Ehrman's reputation.

For all of these reasons, Petitioner is not entitled to a new trial on Counts
7, 10, 13, 16, 19, 25, or 46 of the indictment.

### d. Petitioner Is Not Entitled to a New Trial on the Forgery Counts

Petitioner is also not entitled to a new trial on any of the forgery counts,
albeit for a different reason.  Throughout his brief, Petitioner assumes that the
Court of Appeals narrowed the reach of both N.Y. Penal Law § 190.25 (the
criminal impersonation statute) and N.Y. Penal Law § 170.05 (the forgery
statute); more specifically, he assumes that the two statutes were construed by
the Court to apply only in cases in which a defendant acted with an intent to
cause substantial harm.  (*See, e.g.*, Pet. Br. 23 ("The Court of Appeals holding
... touched on the concept of 'injury' within the forgery statute."); *id.* at 30
("Petitioner Golb was tried and convicted under a sweeping construction of two
statutes that criminalized his use of the real names of other people when he
intended to inflict any injury or obtain any benefit.  The Court of Appeals then
limited legally cognizable benefits or harms[.]"); Pet. Reply 27 & n.7 ("The Golb
Court held that simply communicating under the identity of another real
person, intending the recipient to believe he is such other real person, is *not*
criminal.  It only becomes criminal when the intent of the communication is to
damage another's reputation[,] ... [or] obtain money or interfere with
government administration.")).  While this Court shares Petitioner's belief that
the Court of Appeals narrowed the scope of the criminal impersonation statute,

35

it does not share his belief that the Court of Appeals narrowed the scope of the forgery statute.

When the Court of Appeals narrowed the criminal impersonation statute, it did so very deliberately.  After considering the language and history of section 190.25, the Court of Appeals "agree[d] with [Petitioner] that the statutory terms 'injure' and 'benefit' cannot be construed to apply to *any* injury or benefit, no matter how slight[.]"  *Golb III*, 23 N.Y.3d at 465 (emphasis in original). Ultimately, however, the Court concluded that "substantial" injury, such as "injury to reputation," is "within the 'injury' contemplated by Penal Law § 190.25."  *Id.* at 465-66.  Thus, the Court of Appeals narrowed the scope of particular terms ("injury" and "benefit") that appeared in the criminal impersonation statute.

Contrary to Petitioner's suggestion, the Court of Appeals made no comparable effort to limit the scope of the forgery statute.  Indeed, its analysis of section 170.05 was limited to two sentences:

> "A person is guilty of forgery in the third degree when, with intent to defraud, deceive or injure another, he falsely makes, completes or alters a written instrument" N.Y. Penal Law § 170.05.  There was sufficient evidence to show that [Petitioner] deceived people by sending emails from accounts in the names of Schiffman, Seidel and Cross, and accordingly we affirm his convictions on those counts.

36

*Golb III*, 23 N.Y.3d at 468.[4]  This analysis contains no indication that the Court intended to limit the reach of the forgery statute to cases in which a defendant intends to cause substantial harm.

Indeed, the Court of Appeals' disparate treatment of two counts in the indictment suggests that it made a conscious decision *not* to narrow the reach of the forgery statute to cases where a defendant intends to cause substantial harm.  Counts 29 and 31 were both based on an email that Petitioner sent to Dr. Kohn on November 24, 2008.  (*See* A 27; SA 864).  Count 29 alleged that sending this email constituted criminal impersonation in the second degree, and Count 31 alleged that it constituted forgery in the third degree.  (*See* A 27).  Notably, the Court of Appeals vacated Petitioner's conviction on Count 29 because "the email sent from the Seidel email address to Dr. Kohn, asking her opinion on the differing theories about the Scrolls and whether she was planning to answer Professor Golb's critique … *d[id] not prove the requisite intent to cause injury*, either to reputation or otherwise."  *Golb III*, 23 N.Y.3d at 466 (emphasis added).  But the Court of Appeals affirmed Petitioner's conviction on Count 31.  *Id.* at 471-72.  This affirmation would only make sense if the Court believed that the forgery statute applied to some cases where a defendant acted without any intent to cause substantial injury "either to reputation or otherwise."  *Id.* at 466.

---

[4]     This Court will construe the Court of Appeals' reference to "deceved people" to mean that there was sufficient evidence (which there was) of Petitioner's "intent to … deceive" the recipients of his emails.  N.Y. Penal Law § 170.05.

The lack of evidence that the Court of Appeals narrowed the scope of the forgery statute is fatal to Petitioner's *Shuttlesworth* claim on the forgery counts. As the Supreme Court explained in *Osborne*, *Shuttlesworth* "stands for the proposition that where a State Supreme Court narrows an unconstitutionally overbroad statute, the State must ensure that defendants are convicted under the statute as it is subsequently construed and not as it was originally written[.]"  495 U.S. at 118.  As explained above, however, there is no evidence that the Court of Appeals narrowed section 170.05.  Consequently, this Court cannot say that the Court of Appeals was acting "contrary to ... clearly established Federal law, as determined by the Supreme Court of the United States" when it denied Petitioner's *Shuttlesworth* claim as to the forgery charges.  28 U.S.C. § 2254(d).

**C.    The Court of Appeals Did Not Err in Rejecting Petitioner's Vagueness and Overbreadth Arguments**

**1.    The Court's Determinations Are Entitled to AEDPA Deference**

Petitioner argued to the Court of Appeals that the criminal impersonation statute and the forgery statute were both vague and overbroad.  (Response, Ex. E at 33-53).  In particular, he explained that the statutes were unconstitutionally vague because they "extend[ed] the meaning of fraud into an intangible, non-material realm."  (*Id.* at 37).  He also suggested that the statutes criminalized "expressions of ... opinion, statements of fact, and causing hurt feelings ... , all of which are protected by the First Amendment."  (*Id.* at 33; *see also id.* at 40-42).

38

Nevertheless, the Court of Appeals affirmed the bulk of Petitioner's convictions under the criminal impersonation statute and the forgery statute. By affirming these convictions, the Court suggested that the two statutes (along with the narrowing construction as to the criminal impersonation statute) were constitutional. This suggestion is a decision "on the merits" of Petitioner's constitutional arguments, and, as a result, it is entitled to AEDPA deference. 28 U.S.C. § 2254(d). As set forth in the remainder of this section, there is no basis to disturb the Court of Appeals' rulings in this regard.

### 2. The Court Did Not Act Unreasonably In Rejecting Petitioner's Vagueness Arguments

A statute is unconstitutionally vague if it does not "define [a] criminal offense [i] with sufficient definiteness that ordinary people can understand what conduct is prohibited and [ii] in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender* v. *Lawson*, 461 U.S. 352, 357 (1983); *accord Skilling* v. *United States*, 561 U.S. 358, 402-03 (2010). According to Petitioner, sections 190.25 and 170.05 offend both prongs of the vagueness test because they criminalize impersonation with an intent to hurt someone's reputation. (Pet. Br. 35-43). Petitioner explains that ordinary citizens would not be able to understand what qualifies as an intent to cause a reputational injury (as opposed to an intent to cause "temporary embarrassment" or "discomfiture"). (*Id.* at 39). At the same time, Petitioner suggests, the concept of a reputational injury is so nebulous that it will encourage police to enforce the two statutes in an arbitrary manner. (*Id.*).

39

This Court is not persuaded.  As other courts in this District have recognized, most people understand what a reputation is, and what kinds of conduct are likely to cause reputational injury. *Cf. Carter* v. *Helmsley-Spear, Inc.*, 861 F. Supp. 303, 327 n.14 (S.D.N.Y. 1994) (suggesting, in dicta, that a statute was not unconstitutionally vague, even though it failed to define the word "reputation," because that word has a "common sense, easily understood meaning"), *vacated in part on other grounds*, 71 F.3d 77 (2d Cir. 1995); *Wojnarowicz* v. *Am. Family Ass'n*, 745 F. Supp. 130, 140 (S.D.N.Y. 1990) (holding that a statute was "not impermissibly vague merely because it require[d] a determination as to whether damage to an artist's reputation [was] reasonably likely to result from [a defendant's conduct]").  Thus, this Court cannot say that, as a matter of clearly established federal law, a statute is unconstitutionally vague if it criminalizes conduct undertaken with an intent to harm someone's reputation.

Contrary to Petitioner's suggestion, *Skilling* v. *United States*, 561 U.S. 358 (2010), does not conclusively demonstrate that statutes targeting reputational injuries are unconstitutional.  (*See* Pet. Br. 35-37).  As Petitioner notes, the *Skilling* Court considered whether a federal fraud statute was unconstitutionally vague because it criminalized "a scheme or artifice to deprive another of the intangible right of honest services." *Skilling*, 561 U.S. at 402 (quoting 18 U.S.C. § 1346).  The Court acknowledged that the defendant's "vagueness challenge ha[d] force" because federal appellate decisions regarding "honest services" fraud "were not models of clarity or consistency." *Id.* at 405.

While federal appellate courts had "consistently applied the fraud statute to bribery and kickback schemes—schemes that were the basis of most honest-services prosecutions—there was considerable disarray over the statute's application to conduct outside that core category." *Id.* Thus, the Court determined that the "honest services" statute should be read to criminalize "*only*" bribery and kickbacks. *Id.* at 408-09 (emphasis in original).

According to Petitioner, *Skilling* stands for the proposition that a statute must be considered unconstitutionally vague if it expands "traditional concepts of fraud into the range of the intangible." (Pet. Br. 37). But the *Skilling* Court never suggested that the "honest services" statute was problematic because it criminalized fraud that caused intangible harm. Rather, it found the statute problematic because a series of federal appellate decisions had sown confusion about the meaning of the term "honest services." *See Skilling*, 561 U.S. at 405-09. Recognizing this problem, the Court considered whether there was any conduct that was clearly illegal under the honest services doctrine, and ultimately concluded that there was: the "solid core" of the honest services doctrine was a prohibition against "bribery" and "kickback schemes." *Id.* at 407. Thus, "[t]o preserve the statute without transgressing constitutional limitations," the Court held that the "honest services" statute should "*only*" be applied in cases involving bribery or kickbacks. *Id.* at 408-09 (emphasis in original). [5]

---

[5]     Significantly, Petitioner has not argued that section 190.25 cannot constitutionally be applied to his conduct because the historical, "solid core" of that statute is a prohibition against monetary fraud and interference with government operations. *See Golb III*, 23

It happened that, in *Skilling*, the only conduct that the honest services statute clearly proscribed was monetary fraud.  *Skilling*, 561 U.S. at 408-09.  But *Skilling* did not rule out the possibility that *another* statute — such as section 190.25 or section 170.05 — could create a clear prohibition against non-monetary fraud.  Consequently, *Skilling* does not compel the conclusion that these statutes are unconstitutionally vague.

### 3.   The Court Did Not Act Unreasonably In Rejecting Petitioner's Overbreadth Arguments

Under the First Amendment overbreadth doctrine, a statute will be considered facially invalid if it is "substantial[ly]" overbroad.  *United States* v. *Williams*, 553 U.S. 285, 292 (2008).  In other words, a statute will be considered facially invalid if it prohibits a "substantial" amount of protected speech, "judged in relation to [its] plainly legitimate sweep."  *Broadrick* v. *Oklahoma*, 413 U.S. 601, 613-16 (1973); *see also Williams*, 553 U.S. at 292; *Virginia* v. *Hicks*, 539 U.S. 113, 118-19 (2003).

Petitioner suggests that the criminal impersonation statute and the forgery statute must be considered substantially overbroad in light of the Supreme Court's statements in *United States* v. *Alvarez,* __ U.S. __, 132 S. Ct. 2537 (2012), and *Hustler Magazine, Inc.* v. *Falwell*, 485 U.S. 46 (1988).  (Pet. Br. 37-38, 40).  As set forth herein, the Court disagrees.

---

N.Y.3d at 465 ("Cases applying Penal Law § 190.25 have *traditionally* involved monetary fraud or interference with government operations." (emphasis added)).

### a.   *Alvarez* Does Not Compel a Finding of Overbreadth

In *Alvarez*, the Supreme Court considered the constitutionality of the Stolen Valor Act, which made it a federal crime for any individual to "falsely represent[]," either "verbally or in writing," that he or she had been awarded the Congressional Medal of Honor.  *Alvarez*, 132 S. Ct. at 2543 (plurality opinion). While there was no majority opinion in the case, six justices agreed that the Stolen Valor Act was unconstitutional.  *See id.* at 2551 (plurality opinion); *id.* (concurring opinion of Breyer, J.).

Writing for a plurality of four justices, Justice Kennedy explained that, "[w]here false claims are made to effect a fraud or secure moneys or other valuable considerations, say offers of employment, it is well established that the Government may restrict speech without affronting the First Amendment." *Alvarez*, 132 S. Ct. at 2547.  However, he continued, if the Court were to hold that "the interest in truthful discourse alone is sufficient to sustain a ban on speech, absent any evidence that the speech was used to gain a *material* advantage, it would give government a broad censorial power unprecedented in this Court's cases or in our constitutional tradition."  *Id.* at 2547-48 (emphasis added).  Seizing on this language, Petitioner insists that a statute must be considered overbroad if it criminalizes false speech designed to obtain a non-"material" or intangible benefit; likewise, a statute must be considered overbroad if it punishes false speech designed to cause a non-"material" or intangible harm. (Pet. Br. 37).  Because sections 190.25 and 170.05 criminalize

false speech designed to cause intangible harm to someone's reputation, Petitioner concludes that the statutes are unconstitutional.  (*See id.*).

Even if *Alvarez* could be read to suggest that it is impermissible to punish false speech unless the speaker intended to gain a "material" advantage or cause a "material" harm, the plurality in that case never equated "material" advantages or harms with tangible ones.  *Alvarez*, 132 S. Ct. at 2547-48.  To the contrary, the plurality repeatedly suggested that harms and benefits can be "material" even if they are intangible.  *Id.*; c*f.* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1392 (1961) defining "material" as "being of real importance or great consequence").

For example, the plurality observed that perjury statutes are constitutional, even though they criminalize false speech, because perjury causes intangible harm to "the integrity of judgments that are the basis of the legal system."  *Alvarez*, 132 S. Ct. at 2546 (citing *United States* v. *Dunnigan*, 507 U.S. 87, 97 (1993)).  Similarly, the plurality approved of statutes that "prohibit impersonating a Government officer," because individuals who impersonate government officers can cause intangible damage to "the general good repute and dignity of ... government ... service itself."  *Id.* (quoting *United States* v. *Lepowitch*, 318 U.S. 702, 704 (1943)).  Thus, the *Alvarez* plurality clearly believed it was permissible to criminalize at least some false speech that has the potential to cause intangible injuries.

### b.   *Hustler* Does Not Compel a Finding of Overbreadth

Petitioner also suggests that sections 190.25 and 170.05 should be considered unconstitutionally overbroad in light of certain statements in *Hustler*.  In that case, the Court was careful to note that parody or satire is entitled to First Amendment protection, even if it might "embarrass others or coerce them into action."  *Hustler*, 485 U.S. at 55 (quoting *NAACP* v. *Claiborne Hardware Co.*, 458 U.S. 886, 910 (1982)).  Petitioner argues that the criminal impersonation statute and the forgery statute "reach[] virtually any act of parody that aims to criticize or ridicule another and that can be deemed intentionally 'deceitful' by virtue of its deadpan, imitative nature."  (Pet. Br. 40). Thus, he concludes, the criminal impersonation statute and the forgery statute are unconstitutionally overbroad.  (See *id.* at 35, 40).  This argument, too, misses the mark.

This Court is highly skeptical of Petitioner's suggestion that the criminal impersonation statute and the forgery statute could be read to criminalize parody.  Parody is work "in which the language and style of an author or work is closely imitated for comic effect or in ridicule."  WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1643 (1961).  But a parody can only achieve its comedic or critical goals if the audience *knows* that the work is a parody.  To use the trial court's example (*see* A 632), Tina Fey's parody of Sarah Palin is only funny if the audience knows that Tina Fey is acting.  If the audience truly believes that Tina Fey *is* Sarah Palin, the joke will be lost.  Thus, it seems fair to say that parody is not a genuine form of "imperson[ation]," as that term is

used in section 190.25.  Similarly, it seems fair to say that a parody does not

"purport[] to be an authentic creation," N.Y. Penal Law § 170.00, and as a

result, it cannot be considered a forgery, *see* N.Y. Penal Law §§ 170.00, 170.05.

However, even if the criminal impersonation statute and the forgery

statute could be read to reach some constitutionally protected parody, that fact

would not render the statutes substantially overbroad.  *See Members of City

Council of Los Angeles* v. *Taxpayers for Vincent*, 466 U.S. 789, 800 (1984)

("[T]he mere fact that one can conceive of some impermissible applications of a

statute is not sufficient to render it susceptible to an overbreadth challenge);

*Williams*, 553 U.S. at 303 (same).  Rather, as explained above, the statutes

could only be considered substantially overbroad if they criminalized a

"substantial" amount of protected speech, "judged in relation to [their] plainly

legitimate sweep."  *See Broadrick*, 413 U.S. at 615-16; *see also Williams*, 553

U.S. at 292 (explaining that the Court has "vigorously enforced the requirement

that a statute's overbreadth be substantial" (emphasis omitted)).

Both the criminal impersonation statute and the forgery statute have a

"legitimate sweep" that is fairly wide.  *Broadrick*, 413 U.S. at 615.  As the Court

of Appeals observed, the criminal impersonation statute prohibits monetary

fraud and interference with government operations.  *See Golb III*, 23 N.Y.3d at

465.  Similarly, the forgery statute prohibits a range of fraudulent activity.

Consequently, even if either or both statutes reach some constitutionally

protected parody, this Court will not find, as a matter of clearly established

46

federal law, that the criminal impersonation statute and the forgery statute are substantially overbroad.[6]

By rejecting Petitioner's overbreadth challenges, this Court does not mean to suggest that individuals engaged in constitutionally protected activity can be convicted under section 190.25 or section 170.05.  If an individual engaged in constitutionally protected activity were to be charged with criminal impersonation or forgery, that individual would be free to argue that section 190.25 or section 170.05 was unconstitutional *as applied to his or her conduct*. *See Broadrick*, 413 U.S. at 615-16.[7]  However, this Court cannot say — as Petitioner requests — that either statute so overbroad that it is invalid on its face.

## D.   Petitioner Procedurally Defaulted His *Garrison* Claim

Finally, Petitioner argues that the trial court violated his rights under *Garrison* v. *Louisiana*, 379 U.S. 64 (1964), which held that, for First Amendment reasons, truth must be a defense to any criminal libel charge. (Pet. Br. 43-44).  In particular, he argues that the charges against him "sound[ed] in libel," inasmuch as he was charged with committing a crime by making statements that were calculated to injure someone's reputation.  (*Id.* at 44-45).

---

[6]     Petitioner does not suggest that the forgery statute is overbroad because the Court of Appeal refused to narrow the scope of the terms "deceive" or "injure."  The Court notes, however, that section 170.05 can fairly be described as an ordinary criminal statute, and the Supreme Court has been particularly reluctant to invalidate "ordinary criminal laws" on overbreadth grounds.  *Broadrick* v. *Oklahoma*, 413 U.S. 601, 613 (1973).

[7]     One could argue that certain of the emails at issue, such as the email to Dr. Kohn, were not intended to cause substantial harms (to reputation or otherwise), and as such were more protected by the First Amendment than punishable under section 170.05.  However, Petitioner did not make this argument, and the Court will not make it for him.

Nevertheless, the trial court did not allow Petitioner to argue that the statements he made were true (a curious argument, since, at the very least, the statements were plainly not made by those to whom they were attributed); rather, the trial court found that "truth [was not] a defense to any of the crimes charged here." (*Id.* at 44). Thus, Petitioner insists, the trial court violated his First Amendment rights. This Court must reject Petitioner's *Garrison* argument because the argument has been procedurally defaulted.

### 1. Exhaustion and Procedural Default

Under AEDPA, a state prisoner must "exhaust all of his available state remedies before a federal court can consider his habeas application." *Jackson* v. *Conway*, 763 F.3d 115, 133 (2d Cir. 2014), *cert. denied sub nom. Jackson* v. *Artus*, 135 S. Ct. 1560 (2015) (citing 28 U.S.C. § 2254(b)(1)(A)). If a state prisoner has failed to exhaust state remedies for an alleged violation of his federal constitutional rights, but a state procedural rule would prevent the prisoner from returning to state court to raise his federal constitutional claim, the claim will be considered "procedurally defaulted." *Id.*; *see also Carvajal* v. *Artus*, 633 F.3d 95, 104 (2d Cir. 2011); *Aparicio* v. *Artuz*, 269 F.3d 78, 90 (2d Cir. 2001)).[8] A federal habeas court must dismiss a procedurally defaulted claim unless the individual raising the claim can "demonstrate[e] 'cause for the

---

[8]     The doctrine of procedural default also bars a state prisoner from bringing a constitutional claim in federal court if the prisoner raised the claim in state court, but the state court rejected the claim because the prisoner violated a state procedural rule. *See Jackson* v. *Conway*, 763 F.3d 115, 133 (2d Cir. 2014); *Coleman* v. *Thompson*, 501 U.S. 722, 731-32 (1991).

default and prejudice[,]' or ... show[] that he is 'actually innocent' of the crime for which he was convicted." *Carvajal*, 633 F.3d at 104.

Applying these principles, this Court concludes that: (i) Petitioner's *Garrison* claim has been procedurally defaulted; (ii) Petitioner has not demonstrated cause for the default; and (iii) Petitioner has not shown that he is "actually innocent" of the crimes for which he was convicted.  As a result, this Court must reject Petitioner's *Garrison* claim.

## 2. Respondent Did Not Waive Any Procedural Default Arguments

At the outset, it is important to note that New York State did not waive its procedural default arguments.  In his initial brief to this Court, Respondent did not raise the issue of procedural default, choosing instead to discuss the merits of Petitioner's *Garrison* claim.  However, the Second Circuit has held that federal habeas courts may consider any "procedural default argument ... predicated on a habeas applicant's failure to exhaust [state remedies]," so long as the argument has not been "*expressly* waived." *Carvajal*, 633 F.3d at 105 (emphasis in original).  As Petitioner concedes, a mere failure to discuss procedural default does not qualify as an "express[]" waiver of a procedural default argument.  (Pet. Sup. Br. 5).  Consequently, this Court solicited supplemental briefing from both parties, asking if there were any indications that Respondent had expressly waived the procedural default issue.  (Dkt. #22).

In his supplemental brief, Petitioner contends that the State expressly waived its procedural default arguments when it stated that Petitioner had "exhausted his habeas claims."  (Pet. Sup. Br. 4 (quoting Resp. Br. 6 & n.2)).

49

As Respondent points out, however, this statement does not rule out the possibility that Petitioner's *Garrison* claim was exhausted, yet procedurally defaulted.  (Resp. Sup. Br. 1).

Technically, a state prisoner can satisfy AEDPA's exhaustion requirement by showing that a constitutional claim was not presented in state court, but that state procedural rules prevent the claimant from going to state court and raising the constitutional issue; under these circumstances, there would be an "absence of available State corrective process" for the alleged violation of the prisoner's rights.  *Aparicio*, 269 F.3d at 90 (quoting 28 U.S.C. § 2254(b)(1)(B)(i)). Nevertheless, if a state prisoner satisfies the exhaustion requirement in this manner, the prisoner's claim would also be considered procedurally defaulted. *See id.*  Thus, this Court cannot find that Respondent expressly waived his procedural default argument.[9]

### 3.    Petitioner's *Garrison* Claim Was Procedurally Defaulted

As explained above, when a state prisoner's federal constitutional claim has not been "fairly presented to ... state courts," and state procedural rules prevent the prisoner from returning to the state court system to raise the constitutional claim, the claim must be considered procedurally defaulted.

---

[9]    *Cornell* v. *Kirkpatrick*, 665 F.3d 369, 376 (2d Cir. 2011), is distinguishable from this case.  In *Cornell*, the Second Circuit found that New York State had expressly waived its procedural default arguments because the State conceded that the petitioner's Sixth Amendment claim "had been exhausted in the state courts."  665 F.3d at 376. Crucially, however, the State there had explained that it was conceding the issue of exhaustion because it believed that the petitioner had actually raised the Sixth Amendment issue in state court.  *See id.*  By contrast, in this case, the State never suggested that Petitioner had pressed the *Garrison* issue during the state appellate process.  Thus, Respondent is free to argue that Petitioner's claim has been exhausted, yet procedurally defaulted.

*Carvajal*, 633 F.3d at 106.  Here, Petitioner's *Garrison* claim was not fairly presented to the First Department or the New York Court of Appeals.

In his direct appeal to the First Department, Petitioner argued that the trial court "violated the plain mandate of Article I, § 8 of the *New York State Constitution*[,] which provides: In all criminal prosecutions or indictments for libels, the truth may be given in evidence to the jury[.]"  (Response, Ex. A at 49 (emphasis added)).  Notably, however, Petitioner never claimed that the federal constitution, as interpreted by *Garrison*, guaranteed the right to present truth as a defense to a criminal libel charge.  Consequently, Petitioner never gave the First Department a fair opportunity to consider his *Garrison* argument. *Cf. Carvajal*, 633 F.3d at 107-08 (holding that a state prisoner had not given state courts a fair opportunity to consider his federal claim when he had "relied on state court decisions interpreting state statutory law," and had not "alert[ed] the state courts that his claim was federal in nature").

Similarly, Petitioner did not raise his *Garrison* claim when his case was before the New York Court of Appeals.  In his brief to that Court, Petitioner argued that the criminal impersonation statute and the forgery statute imposed content-based restrictions on speech.  In the course of making this argument, Petitioner suggested that

> [t]he prosecution's trial focus on the content of Raphael Golb's communications is ... demonstrated by the fact that in the course of publishing the emails to the jury — and despite the trial court's ruling that 'neither good faith nor truth is a defense to any of the charges (A 84) — the prosecution repeatedly ... suggested that

> Raphael Golb's accusations of plagiarism and other misconduct were false.

(Response, Ex. E at 50).  However, Petitioner never suggested to the Court of Appeals that the "prosecution's trial focus on the content of [his] communications" was inconsistent with the holding of *Garrison* — indeed, he did not mention *Garrison* at all.  Consequently, New York State courts did not have a fair opportunity to consider Petitioner's *Garrison* claim.

Furthermore, at this point in the litigation, Petitioner could not return to a New York court to raise the *Garrison* issue.  "New York permits only one application for direct review" of a criminal case, *see Spence* v. *Superintendent, Great Meadow Corr. Facility*, 219 F.3d 162, 170 (2d Cir. 2000) (internal citations omitted), and only one application for reargument after an appellate court has decided an issue, *see* N.Y. Ct. R. 500.24.  In addition, if Petitioner were to raise the *Garrison* issue in a collateral proceeding, it would be denied because it could have been — but was not — raised in a direct appeal.  *See* N.Y. Crim. Proc. Law § 440.10(2).  Thus, Petitioner's *Garrison* claim must be considered procedurally defaulted.

### 4. Petitioner Has Demonstrated Neither Cause Nor Actual Innocence

As the Second Circuit explained in *Carvajal*, defense counsel's decision not to "press [an] objection in federal constitutional terms 'does not constitute cause for a procedural default.'"  633 F.3d at 108 (quoting *Murray* v. *Carrier,* 477 U.S. at 486 (1986)).  Petitioner does not identify any other reason why his failure to raise the *Garrison* claim at an earlier point in the litigation should be

excused.  Nor does Petitioner suggest that he is "actually innocent" of the crimes for which he was convicted.  *See id.*  Thus, this Court cannot grant relief on Petitioner's *Garrison* claim.  *See id.*

## CONCLUSION

For the foregoing reasons, the Petition for a writ of habeas corpus is granted in part and denied in part.  Petitioner's convictions on Counts 33 and 37 are reversed; the other convictions remain.

The Clerk of Court is directed to terminate all pending motions, adjourn all remaining dates, and close this case.

SO ORDERED.

Dated:       January 21, 2016
             New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge

53